# IN THE SUPREME COURT OF IOWA

No. 19–1349

Submitted January 21, 2021—Filed April 30, 2021
Amended May 5, 2021

**JENNIFER MORRIS,** Individually and as Administrator of the **ESTATE OF DAULTON HOLLY,** and **JASON ALLAN HOLLY,**

Appellants,

vs.

**LEGENDS FIELDHOUSE BAR AND GRILL, LLC; PRETTY WOMEN, INC.** d/b/a **THE BEACH GIRLS, J.P. PARKING, INC.; JAMES E. PETRY; ABC CORP.,** a fictitious corporation; and **RONALD PAUL HAUSER,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Polk County, David M. Porter, Judge.

Business owner seeks further review of court of appeals decision that reversed summary judgment dismissing negligence claims on grounds that legal duty to patron ended when he left the premises. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Waterman, J., delivered the opinion of the court, in which Christensen, C.J., and Mansfield, McDonald, Oxley, and McDermott, JJ., joined. Appel, J., filed a dissenting opinion.

Christopher D. Stombaugh (argued) and Tiffany R. Wunderlin of DiCello Levitt & Gutzler LLC, Platteville, Wisconsin, and R. Craig Oppel of Allbee & Barclay, P.C., Muscatine, for appellants.

Adam D. Zenor (argued) of Zenor Kuehner, P.L.C., Des Moines, and Sean M. Corpstein of Grefe & Sidney, P.L.C., Des Moines, for appellees.

**WATERMAN, Justice.**

The "law of duty [is] alive and well." *McCormick v. Nikkel & Assocs., Inc.*, 819 N.W.2d 368, 371 (Iowa 2012). In this appeal, we must decide whether the district court correctly granted a "no-duty" summary judgment dismissing a wrongful-death-negligence action against a business. The defendant strip club's security guard had ejected an intoxicated patron outside and offered him a cab ride. The patron refused the cab offer and left on foot. Over thirty minutes later and nearly a half mile away, he was struck and killed by a drunk driver. The decedent's parents and his estate brought this common law negligence action against the strip club and the drunk driver and a dramshop claim against a bar that had served the driver. The district court granted the strip club's motion for summary judgment, ruling that the club owed no continuing duty to the patron after he walked away from its premises. The plaintiffs appealed, and we transferred the case to the court of appeals, which reversed the summary judgment, concluding the district court erred by considering foreseeability in its duty analysis. We granted the defendant's application for further review.

On our review, we hold that the defendants owed no continuing legal duty to the intoxicated patron ejected from inside the business after he refused the offer of a cab ride and chose to walk away. The patron was not ordered to leave the parking lot and could have waited there for another ride on that summer evening. For the reasons explained below, we vacate the decision of the court of appeals and affirm the district court's summary judgment.

## I. Background Facts and Proceedings.

The following facts in the record are undisputed or viewed in the light most favorable to the plaintiffs. On the evening of August 22, 2015,

Daulton Holly, age 22, and his friend Jordan Wills had been drinking since 5 p.m. Holly lived in Tennessee and was in the Des Moines area for work and staying at a hotel. The men took a cab to Beach Girls, a strip club approximately twelve minutes away from their hotel by car. The club was located in a remote, rural area of West Des Moines. Beach Girls allows patrons to bring their own beer to drink inside, and Holly and Wills bought their beer at a convenience store en route. Surveillance video shows them arriving at Beach Girls at 11:37 p.m.

Jeremiah Kraemer was working there as a security guard. He saw Holly and Wills arrive together by cab. Later that night, Kraemer observed Holly repeatedly drop his wallet, knock drinks off a table, and attempt to enter the female dancer's dressing room. Kraemer concluded Holly was intoxicated and escorted him outside. Kraemer told Holly, "Sorry, bud. You've had too much to drink. I can't let you go back inside the club. You can't be drunk in the club. You're just having issues right now. I can't let you go back in." Wills joined them outside and Kraemer told him:

> "Here's the deal. He's intox"-- "he's had a little too much. He just needs to go. You need to get him a cab. I don't know what you want to do, but he can't go back inside. You guys need to figure something out here."

Kraemer later testified that customers "consume alcohol, so it's actually my responsibility to make sure people get home safe, if possible. But also, I can't detain people for no good reason, so if they want to leave, they can leave." While Kraemer said they always offer a cab, it is not his job to call a cab for a customer. Regardless, Kraemer offered a cab to Holly a couple times, which Holly refused. Neither Kraemer nor any other employee ordered Holly to leave the parking lot.

Wills didn't want to leave and argued with Holly. Holly started walking away, and Kraemer told Wills: "You need to try to get him a cab.

It's not safe for him to be walking out around here with dark clothes on." Holly flipped off Wills as he walked away; Wills returned inside saying, "Well, he'll regret it tomorrow." Surveillance video shows Holly walking away from Beach Girls at 1:29 a.m. Kraemer testified that Holly was walking in a straight line when he departed down the club's long driveway that connects with Raccoon River Drive.

At 2:11 a.m., a 911 caller reported a body lying face down on the pavement at the 6400 block of Raccoon River Drive, approximately half a mile from Beach Girls. Police identified the body as Holly. An autopsy showed that at the time of his death, Holly had marijuana metabolites in his blood stream and a blood alcohol concentration of 0.261. Police determined that Ronald Hauser struck and killed Holly with his vehicle. Hauser had been at Legends Fieldhouse Bar and Grill, where he drank between five and six Exile beers, and is shown on video arriving at Beach Girls at 2:07 a.m. Hauser's vehicle had no front-end damage and the DNA and trace evidence were found only on the underside. Based on the physical evidence, Amanda Kilgore, a criminalist at the Iowa Division of Criminal Investigation, concluded that Holly was lying in the road when he was run over.

Hauser pled guilty to Operating While Intoxicated (OWI) and Hit and Run—Serious Injury. Jennifer Morris, Daulton Holly's mother, filed this civil action as administrator of his estate, alleging dram claims against Legends, negligent driving claims against Hauser, and negligence claims against Beach Girls.[1] The petition alleged,

> [t]he negligent acts of the Beach Girls . . . employees, staff, agents, and/or officers in ejecting Daulton Holly from its premises when he was clearly too intoxicated to drive or

---

[1]James E. Petry owns Pretty Women, Inc., and J.P. Parking, Inc., doing business as Beach Girls. We will collectively refer to these defendants as "Beach Girls."

otherwise safely make it back to his hotel without assistance was a direct and proximate cause of the damages sustained by the decedent, Daulton Holly.

Beach Girls denied the allegations and moved for summary judgment, contending that the negligence and premises liability claims "fail[] as a matter of law as to the landowner because the injury to . . . Daulton Holly did not occur on the premises or by an instrument that came from the premises."

The district court granted summary judgment in favor of Beach Girls, concluding that although the business owed patrons a duty of reasonable care while on its property, "when Holly voluntarily left the premises, that duty ceased." The district court reasoned that Holly's fatality "occurred nearly half a mile" from Beach Girls, "approximately 30–40 minutes after" he chose to walk away and that to impose liability under such circumstances

> would put future businesses . . . in the untenable position of making judgment calls on each individual patron and deciding whether . . . they could lawfully restrain a customer from leaving[ or] force them into a cab . . . [when] doing so could theoretically subject business owners to civil or even criminal liability for false imprisonment.

The estate appealed, and we transferred the case to the court of appeals, which reversed the summary judgment, holding that the district court erred in including foreseeability in its duty analysis. We granted the Beach Girls' application for further review.

## II. Standard of Review.

"We review a trial court's grant of summary judgment for correction of errors at law." *Van Fossen v. MidAm. Energy Co.*, 777 N.W.2d 689, 692 (Iowa 2009). "On motion for summary judgment, the court must: (1) view the facts in the light most favorable to the nonmoving party, and (2) consider on behalf of the nonmoving party every legitimate inference

reasonably deduced from the record." *Id.* "Summary judgment is appropriate if 'there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law.' " *Id.* at 693 (alteration in original) (quoting Iowa R. Civ. P. 1.981(3)).

"While summary adjudication is rarely appropriate in negligence cases, the determination of whether a duty is owed under particular circumstances is a matter of law for the court's determination." *Hoyt v. Gutterz Bowl & Lounge, L.L.C.*, 829 N.W.2d 772, 775 (Iowa 2013).

### III. Analysis.

We must decide whether Beach Girls was entitled to summary judgment on grounds that its duty to Holly ended when he walked away from the premises after he was ejected from inside for intoxication and refused its offer of a cab ride. The parties agree that the business owed its patrons a duty of reasonable care for their safety while on its property. Did that duty of care end at its property line? What duty is owed after a business ejects a patron for intoxication? Is the business liable for an accident occurring over thirty minutes later nearly half a mile away?

We begin our duty analysis with general principles of negligence law. "An actionable negligence claim requires 'the existence of a duty to conform to a standard of conduct to protect others . . . .' " *McCormick*, 819 N.W.2d at 371 (quoting *Thompson v. Kaczinski*, 774 N.W.2d 829, 834 (Iowa 2009)). "Historically, the duty determination focused on three factors: the relationship between the parties, the foreseeability of harm, and public policy." *Id.* "In *Thompson* [*v. Kaczinski*], we said that foreseeability should not enter into the duty calculus but should be considered only in determining whether the defendant was negligent." *Id.* "But we did not erase the remaining law of duty; rather, we reaffirmed it." *Id.* "In short, a

lack of duty may be found if either the relationship between the parties or public considerations warrants such a conclusion." *Id.*

The court of appeals reversed the summary judgment for Beach Girls because the district court's duty analysis considered foreseeability. In our view, summary judgment remains appropriate in this case with consideration of foreseeability excised from the duty analysis. Duty is a question of law for the court to decide. *Hoyt*, 829 N.W.2d at 775. In *Hoyt*, we discussed the duty owed in business–patron relationships under section 40 of the Restatement (Third) of Torts. 2 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 40, at 39–40 (Am. L. Inst. 2012) [hereinafter 2 Restatement (Third)]. *See id.* at 775–76. We noted that "[b]usinesses . . . who hold their land open to the public owe a duty of reasonable care to persons lawfully *on their land* who become ill or endangered by risks created by third parties." *Id.* at 776 (alteration and omission in original) (emphasis added) (quoting 2 Restatement (Third) § 40 cmt. *j*, at 43–44).

In *Hoyt*, we held that the defendant bowling alley owed a duty of care to its intoxicated patron who, after being told to leave when he verbally confronted another patron, was assaulted by that patron in the parking lot. *Id.* at 773, 777. Plaintiffs rely on *Hoyt*, noting it reversed the summary judgment for the defendant. *Id.* at 782. *Hoyt* is easily distinguished. Holly was not harmed by another patron and was not harmed on the Beach Girls' premises. Our cases have never extended the business–patron duty of care to these circumstances: harm inflicted by a third party nearly half a mile away and over thirty minutes after the victim left the building. To the contrary, we have held that the business owner's duty to protect patrons from third parties ends when they leave the premises. *See Davis v. Kwik-Shop, Inc.*, 504 N.W.2d 877, 879 (Iowa 1993) (holding that because

the fight occurred after the attackers left its parking lot, Hy-Vee no longer had a special relationship with the assailants and no duty to protect the victim);[2] *see also Brenneman v. Stuelke*, 654 N.W.2d 507, 508, 510–11 (Iowa 2002) (affirming summary judgment for property owner sued for allowing drunk driver to leave; "[o]nce a person leaves the land . . . the individual loses the status of [lawful visitor], and the affirmative duty of the land possessor to control the individual's conduct would cease").[3]

Plaintiffs also rely on *Regan v. Denbar, Inc.*, 514 N.W.2d 751 (Iowa Ct. App. 1994) (en banc). There, Mark Regan and his brothers were playing darts in Katie McButts Tavern in Davenport when a fight ensued. *Id.* at 752. The lone bartender ordered the men to leave; the Regans asked the bartender to call police because they were afraid the men would attack them while they walked to their vehicle. *Id.* The bartender refused, and he walked the men out the back door. *Id.* A man who had struck one of the brothers in the face was outside, claiming to be "cooling off," and the bartender left the brothers and went back inside. *Id.* The man outside then attacked the brothers, and several of the other patrons joined in. *Id.* The feared assault occurred outside the tavern, and the Regans were

---

[2]In *Davis*, we followed the Restatement (Second) of Torts sections 314A, 315, and 318, and noted the business owner's duty to protect patrons from third parties ceased when they left the property. 504 N.W.2d at 878–79. As we discuss below, the same is true under section 40 of the Restatement (Third) of Torts.

[3]The dissent relies, in part, on two Massachusetts cases in support of its argument. *Tobin v. Norwood Country Club, Inc.*, 661 N.E.2d 627 (Mass. 1996), is distinguishable. That court upheld a jury verdict for the family of an intoxicated minor who was fatally injured after walking away from the defendant club where she got drunk. *Id.* at 629–31, 636. The *Tobin* court's liability determination was reinforced by statutory prohibitions on serving alcohol to minors. *Id.* at 633–34. Another Massachusetts case, *Polak v. Whitney*, recognized a duty to warn party guests of nearby dangers over the property line. 487 N.E.2d 213, 215 (Mass. App. Ct. 1985). The *Polak* court affirmed a judgment notwithstanding the verdict for the defendant social host because the danger of parking cars next to highway was obvious. *Id.* at 214, 216. Here, the plaintiffs make no claim that Beach Girls failed to warn Holly and it is undisputed that Kraemer warned Holly that it was unsafe to walk away in dark clothing.

injured. *Id.* They sued the tavern, and the district court granted the defendant's motion for directed verdict. *Id.* The court of appeals reversed, concluding the case presented a jury question as to the foreseeability of the attack. *Id.* at 752–53. *Regan* is readily distinguishable. The plaintiff was harmed just outside the bar by other patrons, including an assailant the bartender knew had just attacked one of the brothers inside. *Id.* at 753. The bartender was on notice that resumption of fighting nearby was imminent, yet refused the plaintiff's request to call the police while waiting safely inside. *Id.* By contrast, the Beach Girls' security guard offered Holly a cab ride that Holly refused. No other patron threatened Holly there, and he wasn't harmed nearby or by another patron. Holly did not ask Kraemer to call the police but rather refused the help offered. Moreover, as the district court found:

> The parties do not dispute that Holly was asked to leave the building. However, there are no facts in this summary judgment record that Holly was forced to leave the premises (including the parking lot area) entirely. Nor does any party assert that Holly was forced to leave the parking lot on foot.

Holly could have waited for his friend or another cab in the parking lot, but instead, he chose to walk away.

Plaintiffs cite no case supporting a continuing duty after Holly chose to leave the parking lot. *Thompson* is distinguishable because there, the plaintiff motorist was injured by an instrumentality—a trampoline left in the defendant's yard that was windblown onto the adjacent road. 774 N.W.2d at 831. Nor does *Mitchell v. Cedar Rapids Community School District* help plaintiffs. 832 N.W.2d 689 (Iowa 2013). That case affirmed a judgment on a jury verdict against a school district for an off-site assault by a student after school hours; but the defendant had failed to preserve

its "no duty" argument for appellate review, and we did not reach it. *Id.* at 691–94, 703–04.

The Colorado Supreme Court recently addressed the duty owed by an innkeeper when evicting an intoxicated guest in *Westin Operator, LLC v. Groh*, 347 P.3d 606, 611 (Colo. 2015). Jillian Groh had rented a Westin hotel room and brought a group of friends back after a winter's night out in downtown Denver. *Id.* at 609. The Westin's

> [s]ecurity guards confronted the group about the noise level in the room and ultimately evicted them, even though Groh and her companions advised the guards that they were drunk and could not drive. On the way out, one of Groh's friends asked a guard if the group could wait in the lobby for a taxicab because it was freezing outside. The guard responded by blocking the door and saying, "No, get the f* * * out of here." Seven people got into Groh's car, with a drunk driver behind the wheel. Fifteen miles away, they rear-ended another vehicle, resulting in a crash that killed one man and left Groh in a persistent vegetative state with traumatic brain injuries.

*Id.* at 608. Groh's parents brought a negligence action against the Westin. *Id.* at 609. The trial court granted Westin's motion for summary judgment, and a divided court of appeals reversed, holding that "a hotel must evict a guest in a reasonable manner, which precludes ejecting a guest into foreseeably dangerous circumstances resulting from either the guest's condition or the environment." *Id.* at 610–11 (quoting *Groh v. Westin Operator, LLC*, 352 P.3d 472, 473 (Colo. App. 2013), *aff'd*, 347 P.3d 606 (Colo. 2015)). A divided Colorado Supreme Court affirmed the court of appeals, rejecting the Westin's argument that its duty "ended 'at the property line.'" *Id.* at 616, 618. The Colorado Supreme Court expressly relied on the "innkeeper–guest special relationship" that "still existed" when the security guard evicted Groh's intoxicated group and refused their request to wait in the lobby for a cab. *Id.* at 616. The majority stated that its holding is expressly limited to "hotels that lawfully evict guests[ and]

does not govern other entertainment-based businesses because the requisite special relationship is absent." *Id.* at 615 n.7. Two justices dissented and would have affirmed summary judgment. *Id.* at 618, 620 (Eid, J., dissenting) ("I know of no authority, and the majority cites none, that would impose a duty on innkeepers to ensure safe transportation for evicted guests.").

Other courts have refused to extend a business owner's duty to protect patrons from harm after ejecting them. *See, e.g.*, *McCall v. Villa Pizza, Inc.*, 636 A.2d 912, 912–13, 915 (Del. 1994) (en banc) (holding tavern owner owed no duty to prevent off-premises injury to an intoxicated patron after evicting him); *Badillo v. DeVivo*, 515 N.E.2d 681, 683 (Ill. App. Ct. 1987) (holding that a bar did not owe a duty to protect an evicted patron from a third-party attack at another location); *Rodriguez v. Primadonna Co.*, 216 P.3d 793, 799 (Nev. 2009) (holding hotel had no duty to prevent subsequent injuries and stating that "so long as a proprietor does not use unreasonable force in evicting a patron, the [business] is not required to consider a patron's level of intoxication in order to prevent speculative injuries that could occur off the proprietor's premises").

*Groh*, which no party in this case has cited, appears to represent the high-water mark for liability for evicting an intoxicated guest who is subsequently injured miles away. Yet *Groh* is distinguishable legally and factually. As the majority made clear, its holding is based on special innkeeper duties to overnight guests and does not extend to entertainment businesses such as Beach Girls. *See Groh*, 347 P.3d at 615 n.7. And while the Westin security guard profanely refused Groh's request to order a cab from the lobby, the Beach Girls' security guard did the opposite and repeatedly offered Holly a cab ride. In addition, in contrast to *Groh*, where

the security guards forced the guests outside in "freezing" weather, the events in this case occurred on a summer night.

Today's case is a far cry from *Weymire v. Wolfe*, where the plaintiff's decedent had been "expelled from the saloon at a late hour of the night, drunk and unconscious, and died by reason of exposure and cold." 52 Iowa 533, 534–35, 3 N.W. 541, 542–43 (1879) (reversing the jury verdict based on instructional error). In *Kelly v. Sinclair Oil Corp.*, we made clear that the duty recognized in *Weymire* requires "outrageous conduct by the defendant" and declined to impose a general duty of care for intoxicated persons after they leave the premises. 476 N.W.2d 341, 343–44, 355 (Iowa 1991) (en banc) (affirming summary judgment dismissing tort claims against defendant tavern brought by victims of juvenile drunk driver who was ejected from tavern parking lot for erratic driving), *abrogated on other grounds by Thompson*, 774 N.W.2d at 836–37. In *Kelly*, we cited with approval California precedent holding that a bartender breached no duty to an intoxicated patron by failing to act on his request for a ride home. *Id.* at 355 (citing *Andrews v. Wells*, 251 Cal. Rptr. 344 (Ct. App. 1988)). In *Andrews v. Wells*, the inebriated patron had been provided a ride home on prior occasions but left after asking the bartender to arrange another ride and was struck and killed by a motor vehicle while crossing the roadway. 251 Cal. Rptr. at 346. The patron's father sued the bartender and owner, alleging the negligent failure to arrange a ride or call a cab caused the death. *Id.* at 345–46. The trial court granted defendants summary judgment, and the California Court of Appeals affirmed, holding the defendants had no duty to arrange or provide a ride even though they had done so previously. *Id.* at 349. A no-duty determination is even more appropriate here because Holly affirmatively refused the offer of a cab ride before he chose to walk away.

The Restatement (Third) does not support extending the business owner's duty to protect patrons from third-party harm *after* they leave the property. Section 7 states that an "actor ordinarily has a duty to exercise reasonable care when the *actor's* conduct creates a risk of physical harm." 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7, at 77 (Am L. Inst. 2010) (emphasis added). The general duty of care in section 7 does not apply because Holly was killed by a third party off site; he wasn't physically harmed by a Beach Girls employee. *See Bell v. Grow with Me Childcare & Preschool LLC*, 907 N.W.2d 705, 717–18 (Neb. 2018) (rejecting argument that section 7 "effectively recognized a general duty of reasonable care to all others at all times"). The relevant physical harm was inflicted by the drunk driver at another location. Rather, the applicable provision regarding a duty to protect against third-party harm is found in section 40, which provides that a business owes a duty of reasonable care to "those who are lawfully on the premises." 2 Restatement (Third) § 40(a), (b)(3), at 39; *see id.* § 37, at 2 (stating that unless an affirmative duty under sections 38–44 applies, generally there is no duty when an actor's conduct "has not created a risk of . . . harm"). We applied section 40 in *Hoyt*, where the fight (third-party harm) occurred in the defendant's own parking lot. 829 N.W.2d at 773, 775–76. "The duty imposed in [section 40] applies to dangers that arise within the confines of the relationship and does not extend to other risks." 2 Restatement (Third) § 40 cmt. *f*, at 41. The duty under section 40 is limited by place and time. *Id.* ("Generally, the relationships in this Section are bounded by geography and time."). The duty ends when the patron leaves the business. For example,

> [T]his Section imposes no affirmative duty on a common carrier to a person who left the vehicle and is no longer a passenger. Similarly, an innkeeper is ordinarily under no

> duty to a guest who is injured or endangered while off the premises. Of course, if the relationship is extended—such as by a cruise ship conducting an onshore tour—an affirmative duty pursuant to this Section might be appropriate.

*Id.*; *see also id.* § 40 cmt. *j,* at 43–44 (limiting the business's duty to protect against third party harm to those "lawfully on their land"); *McGettigan v. Bay Area Rapid Transit Dist.*, 67 Cal. Rptr. 2d 516, 518, 520, 523 (Dist. Ct. App. 1997) (holding that transit operator owed no duty to ensure an intoxicated passenger's safety after a safe exit from the train and stating "[a]ppellant was simply directed onto a train platform; he was not placed in harm's way"); *Rhudy v. Bottlecaps Inc.*, 830 A.2d 402, 408 (Del. 2003) (en banc) (refusing to impose a duty on defendant business "to protect the plaintiffs from an assailant while they were on another's property on which neither [the defendant's] actions nor its inactions were responsible for the robbery and murder").

Liability generally follows control. *See Est. of McFarlin v. State*, 881 N.W.2d 51, 64 (Iowa 2016). "The reason is simple: The party in control . . . is best positioned to take precautions to identify risks and take measures to improve safety." *McCormick*, 819 N.W.2d at 374. Beach Girls had no control over Holly after he left, and it had no control over Hauser before he arrived. No other patron had threatened Holly at Beach Girls. He could have waited for his friend just outside the building. He wasn't ordered to leave the parking lot. He didn't drive away drunk behind the wheel of a motor vehicle. Holly departed that August night on foot and walked over a half mile before he laid down in the travel lane of Raccoon River Drive. We hold that Beach Girls' relationship with Holly, and its duty of care for his safety, ended after he refused its offer of a cab ride and chose

to walk away from its parking lot. Beach Girls was entitled to a "no-duty" summary judgment based on the undisputed facts.[4]

Courts have long recognized that businesses have a right to eject intoxicated patrons. *See Vansant v. Kowalewski*, 90 A. 421, 423 (Del. Super. Ct. 1914) (stating that when a person is "disorder[ly]," "he may be put out in a proper manner"); *Westerland v. Argonaut Grill*, 55 P.2d 819, 820 (Wash. 1936) (holding that the employee "was authorized to eject people if they were drunk or disorderly" but not to use "excessive force"); *see also Billingsley v. Stockmen's Hotel, Inc.*, 901 P.2d 141, 145 (Nev. 1995) (per curiam) (noting that hotel owners may evict individuals who "act[] in a disorderly manner" or "who cause[] a public disturbance" (quoting Nev. Rev. Stat. § 651.020)). Moreover, businesses have a duty to other patrons. *See Hoyt*, 829 N.W.2d at 779 (stating that "bars are business venues in which alcohol-fueled disturbances causing injury and even death are

---

[4]The dissent argues that Beach Girls owed Holly a duty under section 7(a) of the Restatement (Third) of Torts. We conclude that regardless of any overlap between section 7 and section 40, Beach Girls owed no duty to Holly after he left its parking lot. *See* 1 Restatement (Third) § 7(b), at 77 ("In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification."). Section 40 articulates the principle that the duty of reasonable care that a business owes its patrons ends when the patron leaves the premises. *See id.* § 40, at 39. Our longstanding precedent reflects that principle. *See, e.g.*, *Kelly*, 476 N.W.2d at 355. As we discuss above, that principle is well established in other jurisdictions.

The dissent relies on *In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177 (D. Kan. 2015). That decision is inapposite. The federal district court concluded that corn growers and sellers shut out of the Chinese market adequately alleged a legal duty owed them by the developer of genetically modified crop seeds "to exercise reasonable care not to commercialize and sell its product in a way that creates a risk of widespread harm resulting from the intended use of the product by all of its customers." *Id.* at 1186, 1191. The court denied the defendant's motion to dismiss, noting that "[t]he inter-connected nature of the parties' relationship is further demonstrated by Syngenta's representations that it would indeed take certain steps to protect corn sellers from the very harm that occurred." *Id.* at 1191, 1193. Here, the Beach Girls duty ended when Holly left. There was no inter-connected ongoing relationship between the former patron and the strip club after he departed.

known to occur" and that "proprietor[s] who serve[] intoxicating drinks must exercise reasonable care to protect patrons from injury at hands of fellow guests").

While Beach Girls is not a bar, it allows patrons to bring their own alcohol, and it has the same right to eject disorderly patrons to protect against injury or death of other patrons. Our legislature has chosen not to impose social host liability for harm subsequently befalling the intoxicated person. *See* Iowa Code § 123.49(1)(*a*) (2015) (providing social host immunity). A business that ejects an intoxicated person is not liable for harm to that individual elsewhere. *See Brenneman*, 654 N.W.2d at 510. A contrary holding would impose potentially limitless liability on Iowa businesses, putting them in the untenable position to choose whether to forcibly detain intoxicated patrons and risk liability for false arrest or allowing intoxicated patrons to remain on site and risk liability for their on-site harm to themselves or others. *See McGettigan*, 67 Cal. Rptr. 2d at 523–24 (holding that respondent train operator owed no "duty to assist [the appellant] off of the train platform" and challenging the appellant's argument: "Were respondent's employees required to call him a cab for a ride home (in the hope that a cab would accept him)? Were they required to wait with him until the cab pulled up to make sure he did not get in its way?"); *Swartz v. Huffmaster Alarms Sys., Inc.*, 377 N.W.2d 393, 395 (Mich. Ct. App. 1985) (holding restaurant owed no duty to prevent intoxicated patron from voluntarily leaving the premises before he was struck by car crossing the street); *Est. of Bussey v. ABC Cab, Inc.*, No. 338880, 2018 WL 4577958, at *2 (Mich. Ct. App. Sept. 30, 2018) (per curiam) ("[A]sking taxi drivers to physically restrain intoxicated passengers or to call the police when an intoxicated passenger unexpectedly, but voluntarily, gets out of the taxi would be overly burdensome to taxi

drivers."). A contrary holding would impose impractical burdens on Iowa businesses, especially at closing time when patrons depart en masse.

No genuine question of material fact was raised by the affidavit of plaintiff's expert J. Patrick Murphy, who reviewed records of police calls and visits to Beach Girls.[5] Murphy concluded that "the Beach Girl Club breached the standard of reasonable and ordinary care by requiring Mr. Holly to leave the premises in an impaired state and to allow him to continue walking on a minimally lighted street." As noted, Holly refused the offer of a cab ride and could have waited for his friend in the parking lot but chose to walk away. Whether Beach Girls owed Holly a continuing duty after he left its premises is a question of law for the court.

Plaintiff argues that Beach Girls should have called the police to "arrest him . . . or otherwise arrange a safe ride for him back to his hotel." In *Hoyt*, we noted the plaintiff argued the defendant "could have exercised reasonable care by . . . calling the police when the conflict developed." 829 N.W.2d at 780. But in *Hoyt*, the assault occurred in the defendant's parking lot shortly after the bartender observed a verbal confrontation between patrons inside that had escalated to the point that the plaintiff was ordered to leave. *Id.* at 773. By contrast, Holly was docile and threatening no one when he chose to walk away from the parking lot into

---

[5]Beach Girls argues the police records are inadmissible. We assume without deciding that the evidence is properly in the summary judgment record. This evidence, in our view, fails to establish that Beach Girls voluntarily assumed or owed a legal duty to call the police simply to give a ride to an intoxicated patron. The records span a six-year period with only two occasions noted in which police gave a patron a ride home. The records include fifty-eight police reports (averaging less than one per month) for officers dispatched in response to car accidents or crimes such as assaults, vandalism, theft, narcotics, and drunk driving. The arrests for public intoxication included other charges or allegations such as urinating in public, fighting, shots fired, criminal mischief, or refusing to pay a cab driver. There is no record of any pedestrian besides Holly being run over and killed while walking away from Beach Girls. Most of the phone records reflect routine patrols and building checks for that vicinity.

the night. We reject plaintiff's invitation to hold that Beach Girls owed Holly a duty to call the police to detain him or give him a ride to his hotel. *See Smith v. Shaffer*, 395 N.W.2d 853, 854–56 (Iowa 1986) (en banc) (holding tavern owners owed no duty to call police to report intoxicated minors violating curfew who left before the motor vehicle accident and stating that "[s]uch a requirement would be tantamount to making informants out of bar owners and would represent an unjustifiable extension" of dram liability).

Other courts have held that businesses owe no duty to call the police to protect a patron after he leaves the premises. *See, e.g.*, *Wilk v. 1951 W. Dickens, Ltd.*, 696 N.E.2d 756, 760 (Ill. App. Ct. 1998) (holding tavern owed no duty to call police or chaperon minor home and observing that to impose "plaintiff's proposed duty would place 'an unjustifiable burden on the operator and on the police force'" (quoting *Fitzpatrick v. Carde Lounge, Ltd.*, 602 N.E.2d 19, 22 (Ill. App. Ct. 1992))); *Seymour v. House of Blues New Orleans Rest. Corp.*, 309 So. 3d 805, 813 (La. Ct. App. 2020) (holding business "had no duty to call the police" after ejecting patrons before off-site assault), *cert. denied*, 310 So. 3d 191 (La. 2021); *Radke v. Carpenter*, 576 P.2d 365, 367–68 (Or. 1978) (affirming directed verdict for tavern and declining to recognize duty to call police when ejected patrons later involved in off-site assault).

We decline to impose a legal duty on business owners to detain intoxicated customers at their premises until the individual is no longer inebriated or another caretaker arrives. Beach Girls was entitled to summary judgment based on the undisputed facts.

**IV. Disposition.**

For those reasons, we vacate the decision of the court of appeals and affirm the district court's summary judgment.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

All justices concur except Appel, J., who dissents.

#19–1349, *Morris v. Legends Fieldhouse Bar & Grill, LLC*

**APPEL, Justice (dissenting).**

I respectfully dissent. The majority opinion fails to recognize basic principles of tort law. First, the majority decision does not present the facts in the light most favorable to the nonmoving party in a motion for summary judgment. Second, the majority fails to properly analyze duty under the Restatement (Third) of Torts. Third, the majority fails to properly analyze the real issue in this case, which is not one of duty but whether if duty was breached.

When properly analyzed, I find there is no question that the defendants, who operated a strip club where alcohol was consumed, owed a duty of care to a drunken patron, Daulton Holly. Because duty is established, the only real question in this case is whether the defendants breached their duty of reasonable care. Under the summary judgment record in this case, that is a matter for the jury to determine.

**I. Overview of Developments in Law of Negligence.**

**A. Introduction to Tort Law.** As every law student learns in their first year torts class, the common law of torts occupies a very important field in American law. In particular, negligence law has proven to be a mainstay in advancing the very important social goals of tort law: deterrence, compensation, and spreading of risk. A person harmed by the negligence or other types of risk producing conduct should not face a "tough luck" response from the courts. Instead, injured parties generally should have the opportunity to show that because of the risk-producing conduct of others, the injured party is entitled to compensation. The law recognizes that people who are likely to be exposed to potential cost-shifting claims have the opportunity, and in some cases a legal mandate, to purchase insurance, thereby spreading the risk of loss.

No one suggests that this system is perfect, but it is far preferable to a Wild West system of "leave 'em where they are flung" that does not advance the goals of compensation, deterrence, and spreading of the risk of loss. In an era of skyrocketing medical costs that can bankrupt families, the ability to shift the costs and spread the risk can have dramatic impact on injured parties and their families. At the other end of the spectrum, it generally remains true that, subject to certain exceptions such as strict liability, defendants are not insurers. Care must be taken, however, to ensure that undue emphasis on the "defendants are not insurers concept" does not invade the province of a jury and defeat the general application of tort law.

**B. Incoherence of Negligence Law Addressed by Restatement (Third) of Torts.** While the importance of negligence law in the field of torts cannot be doubted, its application has proved troublesome. Sometimes, its scope has been inadequate. It took great common law judges, like Benjamin Cardozo and Roger Traynor, to expand the possibilities of tort recovery beyond the straightjacket of prevailing legal doctrine.

Yet, by the end of the twentieth century, the law of negligence was frequently characterized as a mess. In particular, the approach to the duty analysis has been criticized as inconsistent, unpredictable, and injecting the courts into fact-finding that properly belongs to the jury. The law of negligence was thus a hodgepodge.

For many years, we followed a legal framework that permitted variable and unpredictable duty results, and this remained our approach at the turn of the twenty-first century, as outlined in *Stotts v. Eveleth.* 688 N.W.2d 803, 809–11 (Iowa 2004). In *Stotts*, we suggested that there were three factors to be considered in determining duty: "(1) the relationship

between the parties, (2) reasonable foreseeability of harm to the person who is injured, and (3) public policy considerations." *Id.* at 810 (quoting *J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 258 (Iowa 1999)).

The three *Stotts* elements were not considered distinct tests but were part of a balancing test. *Id.* In other words, the three elements were thrown into a judicial blender, the blender turned on high until the factors were pulverized, and the blend tasted by a trial judge and later judges on appeal. If the taste was sweet, there was a legal duty, if sour, there was no duty. When inquisitive judges asked what was sweet, what was sour, and what should be done with odd tastes, there was no particular answer. Conferences of appellate judges were akin to deliberations by an elite and unrepresentative jury rather than collegial debates over legal rules and their application.

A second highly problematic area of negligence law was the law of proximate cause. In our traditional approach to proximate cause, we divided the issue into cause in fact and legal cause. *See Faber v. Herman*, 731 N.W.2d 1, 7 (Iowa 2007). This approach has been the source of confusion and difficultly. *See Gerst v. Marshall*, 549 N.W.2d 810, 816–17 (Iowa 1996).

Scholars determined that something should be done about the negligence chaos, and as a result, the Restatement (Third) of Torts outlined crisper, clearer principles for courts in determining duty issues and segregating issues to be decided by the courts from issues to be decided by the jury. 1 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 7, at 77–84 (Am. L. Inst. 2010) [hereinafter 1 Restatement (Third) of Torts]. The Restatement (Third) adopted the proposition that "[a]n actor ordinarily has a duty to exercise reasonable

care when the actor's conduct creates a risk of physical harm." *Id.* § 7(a), at 77. Further, risk-creating harm includes "exposing another to natural hazards . . . [or] to the improper conduct of third parties." *Id.* § 7 cmt. *o*, at 84. Obviously, the general duty of an actor to act reasonably with respect to risk creating conduct does not turn on the first *Stotts* factor of the relationship of the parties. It applies to everyone.

The Restatement (Third) permitted a no-duty approach in a very narrow class of cases. *Id.* § 7(b), at 77. According to section 7(b), "[i]n exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification." *Id.* However, foreseeability of harm based on a specific case cannot be the basis of a no-duty determination. *See id.* § 7 cmt. *j*, at 82–83. The Restatement (Third) section 7 thus creates a presumption of a duty of care for all actors that can be modified or avoided only categorically in exceptional cases. *See* Larry S. Stewart, *Clarifications on the Duty to Exercise Care*, 37 Wm. Mitchell L. Rev. 1492, 1494 (2011); Tory A. Weigand, *Duty, Causation and Palsgraf: Massachusetts and the Restatement (Third) of Torts*, 96 Mass. L. Rev. 55, 58 (2015) [hereinafter Weigand, *Duty*].

The Restatement (Third) is "specific and deliberate" in its view "that courts too often take cases away from [juries]" through a no-duty finding. Weigand, *Duty*, 96 Mass. L. Rev. at 60. The Restatement (Third) emphasizes

> that an actor ordinarily has a duty to exercise reasonable care. . . . Thus, in cases involving physical harm, courts ordinarily need not concern themselves with the existence or content of this ordinary duty. They may proceed directly to the [remaining] elements of liability.

1 Restatement (Third) of Torts § 6 cmt. *f*, at 69.

The Restatement (Third) also removed the second *Stotts* factor, foreseeability, from the duty analysis. Under the Restatement (Third), the question of foreseeability is a factor in determining whether there was a breach of duty. *Id.* § 7 cmt. *o*, at 84. The practical impact of the Restatement (Third) approach is to shift foreseeability analysis from the judges' chambers, where no duty is considered, and place it in the jury room, where the question of whether the defendant breached the duty is determined.

The third *Stotts* factor in the determination of duty is the public interest. As noted above, the Restatement (Third) dramatically limited its applicability in the duty determination to categorical consideration in exceptional cases and excluded foreseeability from the no-duty analysis. *Id.* § 7(b), at 77.

The Restatement (Third) included a provision related to duties arising out of special relationships. 2 Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 40, at 39–40 (Am. L. Inst. 2012) [hereinafter 2 Restatement (Third) of Torts]. Specifically, section 40 of the Restatement (Third) generally provided that "[a]n actor in a special relationship with another owes the other a duty of reasonable care with regard to risks that arise within the scope of the relationship." *Id.* § 40(a), at 39. Special relationships include a possessor of land who "holds its premises open to the public with those who are lawfully on the premises." *Id.* § 40(b)(3), at 39.

In analyzing whether a breach of duty is present, the first question to be addressed is whether the actor engaged in conduct that "creates a risk of physical harm." 1 Restatement (Third) of Torts § 7(a), at 77. In order to find a duty under section 7(a), the actor must be engaged in

affirmative conduct. *Id.* § 7 cmt. *l*, at 83. Mere knowledge of a dangerous situation, for instance, is not enough to create a duty under section 7(a). *Id.* But if there is affirmative conduct, a general duty of care to others arises. *Id.*

If there is no affirmative conduct, but only omissions, then the analysis shifts to a second question, namely, whether any of the affirmative duties in sections 38 through 44 of the Restatement (Third) are applicable. *See* 2 Restatement (Third) of Torts § 37, at 2. Under sections 38 through 44, a duty of care may arise even in situations where there are merely omissions or failure to act because of the special relationship of the parties. *See generally Bell v. Grow with Me Childcare & Preschool LLC*, 907 N.W.2d 705, 714–21 (Neb. 2018) (discussing situations when a duty of care may arise from mere omissions or inaction but finding no special relationship existed to create that type of duty). It is important to note, however, that limitations on duties found in sections 38 through 44 do not have any application where the duty arises from section 7(a). *See In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1191 (D. Kan. 2015).

The Restatement (Third) addressed the question of what constitutes breach of duty in section 3. According to this section:

> A person acts negligently if the person does not exercise reasonable care under all the circumstances. Primary factors to consider in ascertaining whether the person's conduct lacks reasonable care are the foreseeable likelihood that the person's conduct will result in harm, the foreseeable severity of any harm that may ensue, and the burden of precautions to eliminate or reduce the risk of harm.

1 Restatement (Third) of Torts § 3, at 29. In evaluating breach, there is no requirement that the actor could have taken action to eliminate the harm, but only that the actor could have "reduced the risk." *Id.* § 26 cmt. *e*, at 349.

Finally, the Restatement (Third) addressed the challenging issue of proximate cause.  The Restatement (Third) divided the issue of proximate cause into factual cause and scope of liability.  *See generally id.* §§ 26–28, at 346, 376, 399 (describing the law on factual cause); *id.* §§ 29–36, at 493, 542, 546, 555, 562, 569, 592, 597 (describing scope of liability).  The question of whether an actor's conduct was a "substantial factor" of harm was part of the factual cause inquiry and was for the jury to decide, not the court.  *Id.* § 27, cmts. *b*, at 377–78, *e*, at 379–80.

The focus for the court was on the question of the scope of liability as described in Restatement (Third) section 29.  The scope of "liability is limited to those [physical] harms that result from the risks that made the actor's conduct tortious."  *Id.* § 29, at 493.  The question of foreseeability plays a role in the scope of liability analysis.  *Id.*  As noted in section 29, the scope of liability "test exclude[s] liability for harms that were sufficiently unforeseeable at the time of the actor's tortious conduct that they were not among the risks—potential harms—that made the actor negligent."  *Id.* § 29 cmt. *j*, at 505.

The Restatement (Third) drafters believed that in most cases, the scope of liability, like the duty question, would be a nonissue.  *Id.* § 29 cmt. *a*, at 493–94.  And, the Restatement (Third) emphasized where the issue is debatable, or requires somewhat of an arbitrary line drawing, "those cases are left to the community judgment and common sense provided by the jury."  *Id.* § 29 cmt. *i*, at 505.

**C. Adoption of Restatement (Third) Approaches to Duty, Breach of Duty, and Causation.**

1. *Introduction.*  The first drafts of the Restatement (Third) of Torts began circulating as early as 2005.  The tentative drafts were soon approved, though publication of the document itself was delayed until

2010 for volume 1 and 2012 for volume 2. In three important cases, this court considered and, for the most part, adopted the provisions of the Restatement (Third) related to duty, breach of duty, and causation.

2. Thompson v. Kazinski. In *Thompson v. Kazinski*, we considered a case where a trampoline from a yard in rural Madison County was blown onto a road in a severe storm, causing a serious accident. 774 N.W.2d 829, 831–32 (Iowa 2009). One of the central issues in the case was whether the defendants had a duty of reasonable care to secure the trampoline to prevent the harm. *Id.* at 834–36. In considering the duty issue in *Thompson,* we abandoned the three-pronged balancing approach to duty in *Stotts* in favor of the approach of the Restatement (Third) of Torts. *Id.* We rejected the district court's no-duty determination based upon the district court's application of the foreseeability analysis. *Id.* at 835. We further concluded that under the approach of the Restatement (Third), there was no exceptional categorical public policy rational to defeat application of the general obligation of reasonable care. *Id.*

We also addressed the question of causation. We noted that the court's traditional application included analyzing the cause in fact and legal cause. *Id.* at 836. Legal cause was often expressed as "proximate cause," a label that proved confusing to judges and juries alike. *Id.* at 836–37. In *Thompson,* we adopted the approach to causation in the Restatement (Third). *Id.* at 836–39. Instead of notions of "proximate cause," we held that causation should be divided into "factual cause" and "scope of liability." *Id.* at 837–39. Factual cause, as the term suggests, is a factual issue for the jury and includes the notion that the actor's conduct must be a substantial cause of the resulting injury. *Id.* Under the Restatement (Third), however, the court has responsibility to determine whether the injuries were within "the scope of liability." *Id.* at 838. In

general, "[a]n actor's liability is limited to those physical harms that result from the risks that made the actor's conduct tortious." *Id.* (quoting 1 Restatement (Third) of Torts § 29, at 493). Based on our analysis of the case, we concluded the risk of disassembling and untethering of a trampoline in a backyard less than forty feet from the roadway gave rise to a jury issue on breach of duty. *Id.* at 839.

3. Mitchell v. Cedar Rapids Community School District. In *Mitchell v. Cedar Rapids Community School District*, we explored the issue of scope of liability. 832 N.W.2d 689, 694–702 (Iowa 2013). In *Mitchell*, a special education student, D.E., functioning at a third grade level, susceptible to persuasion, and under constant supervision, was missing from school. *Id.* at 691–93. Further, a teacher was aware that another student was being amorous with D.E. *Id.* at 691–92. Ultimately, the student was raped off campus. *Id.* at 693. The plaintiff claimed that the school should have taken a number of measures to prevent the student from leaving school in the first place and then to find her after she was missing. *Id.* at 693–94.

The question preserved in *Mitchell* was whether the harms that befell the student were within the scope of liability caused by the conduct of the school. *Id.* at 694.

In addressing the scope of duty question, we noted that the critical question under section 30 of the Restatement (Third) was "whether the risks posed by the tortious conduct of the actor would, if repeated, make it more likely that harm such as that suffered by the other person would . . . occur." *Id.* at 699 (quoting 1 Restatement (Third) of Torts § 30 cmt. *a*, at 543). We concluded that under the record in the case, the fact that the highly susceptible special needs student left school early and unsupervised raised a jury question of whether the conduct of the school

increased the risk that she would suffer the harm resulting from the rape. *Id.* at 701.

The school defendants argued the fact that the rape occurred off campus was dispositive of the question of scope of liability. *Id.* at 701–02. We rejected the argument. *Id.* at 702. We noted that the limitations in section 40 limiting the school's "affirmative duty of reasonable care to risks occurring 'while the student is at school or otherwise engaged in school activities' is silent as to the appropriate scope of liability for risks arising at school but materializing at some later time." *Id.* at 701 (emphasis removed).

We concluded that while the duty issue was not preserved, the defendants failed to show that the evidence was insufficient to show conduct within the scope of liability. *Id.* We cited a number of cases for the proposition that schools may be liable for injuries to students off school grounds and after school hours where the breach of duty occurred on school grounds. *Id.* at 701–02 (citing *Perna v. Conejo Valley Unified Sch. Dist.*, 192 Cal. Rptr. 10, 12 (Ct. App. 1983) (stating that a school district could be liable for its negligence on premises despite the actual injuries suffered occurring off school grounds or after school hours); *Doe v. Escambia Cnty. Sch. Bd.*, 599 So. 2d 226, 228 (Fla. Dist. Ct. App. 1992) (reversing summary judgment where school district arguably breached duty to supervise mentally disabled fourteen year old who left school grounds during lunch period and was later assaulted); *Gary v. Meche*, 626 So. 2d 901, 905 (La. Ct. App. 1933) (finding school liable for a failure to ensure that children remained in school despite the injury occurring off campus and after hours); *Sutton v. Duplessis*, 584 So. 2d 362, 366 (La. Ct. App. 1991) (holding school could be held liable when six year old was injured after running into street because the school authorities should

have foreseen the potential risk); *Jerkins v. Anderson*, 922 A.2d 1279, 1281 (N.J. 2007) (holding that a school may be liable for off-campus injury when the school does not develop reasonable dismissal policy)).

We recognized cases coming to a different result using "the old duty framework" of the Restatement (Second) of Torts, but we noted that these cases focused on foreseeability in their determination of lack of duty. *Id.* at 702. Foreseeability, of course, is not part of the duty analysis under the Restatement (Third). *Id.* For purposes of the issue of scope of liability, we did not find the older cases persuasive. *Id.* We noted, among other things, that the scope of liability analysis should protect the role of the jury. *Id.*

4. Hoyt v. Gutterz Bowl & Lounge. In *Hoyt v. Gutterz Bowl & Lounge LLC*, the plaintiff was a bar patron who was injured in a bar fight in the parking lot after he had left the bar. 829 N.W.2d 772, 773 (Iowa 2013). We found that the bar owner owed a duty to protect a patron from the injuries in the case. *Id.* at 777. We noted that the general duty of care should be limited only in exceptional cases in which "an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases." *Id.* at 775 (quoting 1 Restatement (Third) of Torts § 7(b), at 77). We concluded, however, that there is no principle or strong policy considerations that exempts bar owners from the duty to exercise reasonable care. *Id.* at 777. So, the notion that the activity of serving alcoholic beverages to patrons is entitled to exceptional treatment in determining duty under the Restatement (Third) was explicitly rejected in *Hoyt*.

The *Hoyt* court also considered whether under section 40 of the Restatement (Third), liability could arise even in cases involving harm caused by third parties. *Id.* at 776. We concluded that Restatement

(Third) of Torts section 40 comment *g* provided for such third-party liability. *Id.* In particular, we noted that the duty applied "to risks created by the individual at risk as well as those created by a third party's conduct, whether innocent, negligent, or intentional." *Id.* (quoting 2 Restatement (Third) of Torts § 40 cmt. *g*, at 42).

We next considered an alternate ground for summary judgment, namely, whether under the summary judgment record, the defendant exercised reasonable care as a matter of law. *Id.* at 777–80. We concluded that on the question of breach, the court could consider whether the injury as a matter of law was unforeseeable. *Id.* at 779–80. But, we emphasized that the question of breach is a matter for the jury unless no reasonable jury could differ on the matter. *Id.* at 780. We concluded that the tavern could have acted reasonably by contacting the police, escorting Hoyt to his vehicle, or verifying that Knapp was not lying in wait. *Id.*

Finally, we considered the question of scope of liability. We noted that tort law did not necessarily impose liability for all harm factually caused by the actor's conduct. *Id.* at 780. Emphasizing *Thompson*, we stated that the scope of liability was limited to "the risks that make [the] actor's conduct tortious." *Id.* at 780 (citing *Thompson*, 774 N.W.2d at 838). In discussing the issue, we noted that it was not necessary that the detail of a subsequent injury be specifically part of the range of risk, but instead, a jury could approach the range of risks in a more general way. *Id.*

We closed by recognizing that there were a number of issues involved in the case that should be left to the jury's determination. *Id.* at 782. Specially, we found the questions of "(1) the relevant breach and scope-of-liability . . . and (2) comparative fault" are matters best decided by the jury rather than the court on summary judgment. *Id.*

5. *Summary.* The above cases establish several principles of law. First, foreseeability is not part of the duty analysis and, as a result, is generally for the jury to consider under breach of duty. Second, exceptions to the duty analysis based on public policy are reserved to exceptional cases where the public policy is clearly articulated by the court. Third, in the case of a tavern serving intoxicating beverages, public policy considerations did not categorically bar liability for injuries to a bar patron inflicted by a third party who had left the bar. Fourth, on the issue of breach, the question is for the jury except where no reasonable jury could come to another conclusion. Fifth, on the issue of scope of liability, whether the injury arose from the risks that made the conduct tortious is ordinarily a matter for the jury. Sixth, we found that the fact that an injury occurred off-premises did not prevent liability under a scope of liability theory and noted that while the duty question was not preserved, the cases finding no liability for off premises injuries were based upon foreseeability, a concept inapplicable to no-duty determinations under the Restatement (Third).

## II. Application of Restatement (Third) Principles.

**A. Overview of the Facts.** In a motion for summary judgment, we view the facts and make all permissible inferences in favor of the nonmoving party. *See Van Fossen v. MidAm. Energy Co.*, 777 N.W.2d 689, 692 (Iowa 2009). Here, the facts seen in the proper perspective show that at the time the staff determined that Holly was intoxicated, he was docile. Because he was docile, he was not a risk to other patrons. Staff member Kraemer testified that he knew that because of its rural location with poor lighting, the docile but intoxicated Holly would be at risk if he left the premises on his own. And Kraemer further testified that part of his job duties was "to try to get customers home safely." Kraemer specifically

recognized that the risk of harm to Holly in the remote and poorly lit rural setting was intensified because he wore dark clothing. He knew that near the club was a country road, Raccoon River Drive, without many streetlights. The staff decided to eject the docile patron at 1:30 a.m. even though he left the premises on foot and would be walking into recognized danger given his intoxication, his dark clothes, and the nearby presence of a poorly lit country road. The ejection of Holly occurred at 1:30 a.m. on a Sunday morning within the vicinity of the rural strip club that stayed open until 3:00 a.m. and was thus a potential last stop for consumers of alcohol. Although Holly was offered a cab and refused, the staff did not tell Holly that the police would be called if he insisted on walking off the premises in his intoxicated state. Over the years, the police had been called many times with respect to problems at the strip club and often responded. Holly's friend was not advised that the police would be called if he insisted on walking away into the dangerous darkness wearing dark clothes. And, of course, the police were not called.

The staff at the club were right to recognize the danger if Holly walked away. The twenty-two-year-old Holly was hit and killed roughly a half hour later by an automobile driven by an intoxicated thirty-seven-year-old driver on his way to the strip club. On a motion for summary judgment, the plaintiff offered a security expert who declared that if the defendants had an appropriate policy in place regarding intoxicated patrons and had followed a policy whereby Holly was presented with the choice of calling a cab or the police being called, it is more likely than not that no accident would have occurred. The security expert stated that because Holly was docile, "there was no pressing need to require him to leave the entire property" and that "[i]t would . . . not be reasonable to

allow a patron, who was clearly identified as intoxicated, to leave the premises on foot onto a minimally lighted street."

**B.  Lower Court Rulings.**  The district court granted the defendants' motion for summary judgment.  Although the district court recognized that we recently decided *Thompson* and *Hoyt,* it applied the prior law articulated in *Stotts* contrary to these cases.  For instance, the district court adopted the outdated three-pronged *Stotts* test that included foreseeability of harm and public policy in the duty analysis and that the court should engage in a balancing test involving the applicable factors.

The court emphasized the foreseeability factor in granting summary judgment.  It stated that

> foreseeability must be evaluated in the relevant frame of time and place.  Here, the injuries Holly sustained occurred nearly half a mile from the Movants' premises, approximately 30 – 40 minutes after he was last captured on video, and were inflicted by a person who was not a patron of Beach Girls that evening.

In considering the *Hoyt* case, the district court then went on to observe that "[s]mall changes in facts may make dramatic changes in how much risk is foreseeable."  Similarly, in discussing the case of *Regan v. Denbar, Inc.,* 514 N.W.2d 751, 752 (Iowa Ct. App. 1994), the district court found the case distinguishable because that bar fight case "pass[ed] the most basic foreseeability analysis."  According to the district court, in the fight setting, the bartender has "a duty of reasonable care," and "in light of foreseeability," it was reasonable to call the police.  The district court found that this case did not involve "a conscious decision not to act, despite the clear foreseeability of harm."

The district court was clearly applying foreseeability in the duty analysis contrary to *Thompson.*  And on appeal, the court of appeals

reversed.  The court of appeals noted that the question of foreseeability should not have been included in the duty analysis under *Thompson.*

**C. The Question of Duty under the Restatement (Third) of Torts.**  I think there is no question that the defendant owed a duty to its intoxicated patron when it decided to remove him from the premises.  The duty plainly arises under section 7(a) of the Restatement (Third) of Torts. In this case, it was undisputed that the employees of the strip club engaged in affirmative conduct in ejecting the patron from the bar.  And, as admitted by the employee, the action created a risk of physical harm to the patron.[6]  In light of the undisputed affirmative conduct, there is no need to resort to the second step of the duty analysis and determine whether there is liability of omissions arising out of a special relationship under section 40.  Here, the duty is based on section 7(a) type conduct.[7]

---

[6]This line of reasoning is hardly novel.  In *Brown v. Chi., Rock Island & Pac. R.R.,* we considered a claim that a railroad improperly failed to use reasonable and ordinary care in ejecting a railroad passenger from a train about a mile from the station.  51 Iowa 235, 237–38, 1 N.W. 487, 490 (1879).  The jury returned a verdict of $1,000 for the plaintiff.  *Id.*  Among other things, the jury instructions stated that the conductor had an obligation in ejecting the passenger to "exercise such ordinary care in ejecting him as an ordinarily prudent man would exercise under similar circumstances as connected with this case."  *Id.* at 237, 1 N.W. at 489 (emphasis omitted).  On appeal, the court affirmed this portion of the instruction.  *Id.* at 237–38, 1 N.W. at 489–90.  In the opinion, Justice Day noted "all the circumstances should be considered, as the physical condition of the person ejected; the time, whether in daylight or late at night; the condition of the country, whether thickly or sparsely settled; the place of the ejection, whether near to or remote from dwellings of any character, including stations; the character of the weather, whether pleasant or inclement."  *Id.* at 238, 1 N.W. at 490.  According to Justice Day, "[t]he rules of law, as well as the dictates of humanity, require that the ejection shall . . .  not unreasonably . . . expose the party to danger."  *Id.*  The verdict was reversed, however, on the grounds that an instruction stating that the conductor's right to eject nonpaying passengers was limited to ejection at places "not remote from stations" was overbroad and that the reasonableness of ejection depended upon the entirety of facts and circumstances.  *Id.* at 238, 1 N.W. at 489–90.

[7]Restatement (Second) of Torts section 315 provides that "[t]here is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless . . . a special relation[ship] exists."  2 Restatement (Second) of Torts § 315, at 122 (Am. L. Inst. 1965).  But even under the Restatement (Second), the rule only applies to cases "where the peril in which the actor knows that the other is placed is not due to any active force which is under the actor's control."  *Id.* § 314 cmt. *d*, at 117.  As

The majority's own authorities support this view. For instance, in *Rodriguez v. Primadonna Co.*, the Supreme Court of Nevada considered a case where a plaintiff alleged that he suffered injuries arising from an unreasonable ejectment from a hotel. 216 P.3d 793, 795–96 (Nev. 2007). The court stated that "a proprietor has a duty to act reasonably" when evicting a person from the premises. *Id.* at 799. This is also true under both Restatement (Third) of Torts section 7 and section 40. Under Restatement (Third) of Torts section 7(a), a party has a general duty of care to use ordinary care in activities from which harm may reasonably be anticipated. 1 Restatement (Third) § 7(a), at 77. Under section 40, liability arises from the relationship of the parties. 2 Restatement (Third) of Torts § 40, at 39–40. The manner in which a person is removed from the premises arises from the relationship of the parties. While liability under section 7 requires that the tortfeasor be actively careless, liability under section 40 may arise for omissions or failure to act affirmatively to prevent harm. *Compare* 1 Restatement (Third) of Torts § 7(a), at 77, *with* 2 Restatement (Third) of Torts § 40, at 64–65. In other words, plaintiffs have an ordinary negligence claim under section 7(a), not merely a premises liability claim under section 40.

The majority seeks to limit the duty issue to section 40 in order to inject limitations on duties arising out of special relationships into this case. But where an actor actively removes a patron from the premises, that action triggers a duty of reasonable care under section 7(a) to use reasonable care. As a result, any limiting provisions of section 40 cannot be used as a sword to undercut the ordinary care requirement of a person

---

noted by the Restatement (Third), section 315 of the second restatement "did not address the ordinary duty of reasonable care with regard to conduct that might provide an occasion for a third party to cause harm." *See* 2 Restatement (Third) of Torts § 37 cmt. *d*, at 5; *see also In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. at 1191.

performing affirmative acts under section 7(a). This is thus not a case where liability arises from an omission for mere failure to protect someone. By engaging in the specific conduct of removing a person from the premises, the actor must act reasonably.

Thus, although there is a statement in the comments to section 40 that "an innkeeper is ordinarily under no duty to a guest who is injured or endangered while off the premises," 2 Restatement (Third) of Torts § 40 cmt. *f*, at 41, this general rule has no application where the proprietor affirmatively ejects the patron and thrusts that patron into an environment with known safety hazards. And even if the rule were applicable, it has no bearing on this case. Here, the alleged breach of duty occurred while Holly was on the defendant's property. Nothing in section 40 provides that liability is limited to injuries that occur on the property so long as the wrongful conduct occurs on the premises within the scope of the parties' relationship.

The "on the premise" question was briefly mentioned in *Mitchell.* 832 N.W.2d 689. Although we determined that the injury in *Mitchell* occurred off premises and did not affect the scope of duty analysis, we did not directly address the unpreserved issue of duty. *Id.* at 694–702. We did note, however, that the "old cases" supporting no-duty findings for off-premises injuries relied on a foreseeability analysis, an approach not adopted by the Restatement (Third) for purposes of the duty analysis. *Id.* at 702. In my view, we should finish the job started in *Mitchell* and find that where the breach of duty occurs on premises, the limitations of section 40 of Restatement (Third) have been satisfied.

For example, in *Regan v. Dunbar,* the court held that a business owner had a duty with respect to a fight that occurred in an alleyway off premises. 514 N.W.2d at 753. Thus, the fact that the injury occurred

outside the boundaries of the property was not an immunity shield for the on-premises conduct. The majority, like the district court, seeks to distinguish *Dunbar* on grounds of foreseeability. But that's the problem. The majority is simply wrong to apply foreseeability analysis on the question of duty. Further, if the Restatement (Third) authors had meant to limit liability in all cases to where the breach of duty occurred on premises but the resulting injury occurred off premises, it would have so declared.

The majority relies on the pre-Restatement (Third) cases that do not use the duty approach of the Restatement (Third) and thus have little value for us in this case. Cutting and pasting cases that do not apply the duty analysis of the Restatement (Third) has potential to lead us astray. For example, the majority relies on *Rodriguez*, 216 P.3d 793. *Rodriguez* relied primarily upon Nevada statutes which the court believed precluded a finding of liability. *Id.* at 798. Further, the underlying precedent relied upon in *Rodriguez* is *Mills v. Continental Parking*. *Id.* at 799 (citing 475 P.2d 673 (Nev. 1970)). In *Mills*, the court relied upon policy considerations and unforeseen consequences. *See Mills*, 475 P.2d at 726. Of course, unforeseen consequences under the Restatement (Third) are no longer part of the duty analysis, and while policy considerations are appropriate, under section 7(b), the court must articulate a categorical reason for the extraordinary conclusion of nonliability. Similarly, the majority cites *Badillo v. DeVivo*, 515 N.E.2d 681 (Ill. App. Ct. 1987). *Badillo* also relies on foreseeability in its duty analysis. *Id.* at 683–84. By citing cases which do not employ the Restatement (Third) analysis, the majority brings the foreseeability analysis into the equation through the back door. Although it eschews foreseeability, the majority then cites cases in support of its position that are based on foreseeability.

The majority cites *Westin Operator, LLC v. Groh.* 347 P.3d 606 (Colo. 2015) (en banc). In this case, a hotel was sued by plaintiffs who claimed they were part of a group of people drunk at the time they were evicted by the hotel and ultimately were involved in a car accident, which resulted in serious injuries, when one of the evicted and intoxicated members of the group drove drunk. *Id.* at 608. The *Groh* court held that the hotel had a duty to evict guests in a reasonable manner. *Id.* at 615. *Groh* presents precisely the type of claim brought by the plaintiff in this case. In a footnote, the *Groh* court suggested that the approach did not apply to "entertainment based businesses because the requisite special relationship is absent." *Id.* at 615 n.7. The *Groh* court does not explain how there is a special relationship in the hotel industry but not in the entertainment industry. But here, the district court found a special relationship as suggested in Restatement (Third) section 40(b)(3). And in any event, where a party engages in affirmative acts, it has a general duty of care under Restatement (Third) section 7(a). So, despite the footnote, I claim the *Groh* case as largely supportive of my position here.

There are other supportive cases. For example, in *Tobin v. Norwood Country Club, Inc.*, the Supreme Court of Massachusetts found that a country club had a duty to an intoxicated minor who left the club on foot and began walking in the breakdown lane of a highway and, after other teenagers urged him to get into a van, was hit by a passing vehicle. 661 N.E.2d 627, 629–30, 633 (Mass. 1996). The court in *Tobin* emphasized in a footnote that it was not imposing strict liability, *id.* at 636 n.13, as the majority in this case fears. The *Tobin* court noted that if the vendor had reasonable policies in place regarding underage drinking and those policies had been followed, liability could have been avoided. *Id.*; *see also Polak v. Whitney*, 487 N.E.2d 213, 214–15 (Mass. App. Ct. 1985) (holding

that where alcohol was served at residence, duty did not end abruptly at the boundary line of the property over which owner exercised control).

Assuming the presence of a duty, under the Restatement (Third), the question then arises under section 7(b) whether this case is part of an extraordinary category of cases that the public interest demands a finding of no liability as a matter of law. *See* 1 Restatement (Third) § 7(b), at 77. Under the Restatement (Third), vague ad hoc assertions of public interest are not sufficient. *See id.* § 7(b) cmt. *a*, at 77–78. Instead, there must be a broad category of activity that is so socially valuable, so important that no liability must be the rule. *See id.* According to *Thompson*, where no-duty rulings are based on public policy, there must be "articulated policy or principle in order to facilitate more transparent explanations of the reasons for a no-duty ruling and to protect the traditional function of the jury as factfinder." 774 N.W.2d at 835 (quoting 1 Restatement (Third) of Torts § 7 cmt. *j*, at 98–99). And, it is clear under the Restatement (Third) that foreseeability is not an appropriate consideration in the consideration of whether an exceptional situation demanding a categorical no-duty rule is required.

Transparency is important. If the majority wishes to rule, as a matter of law, that strip clubs offering an alcohol-fueled sexualized venue provides such a socially important activity that it is entitled to an exemption from ordinary duty analysis, the majority should just come out and say it. Or, perhaps the majority thinks the sale of alcohol is akin to the sale of cutting edge pharmaceuticals that should be encouraged because of the social good that results from the activity. But if the public interest in cases involving the serving of alcohol to the point of intoxication is so pressing, the majority should so state and state why.

It will be hard for the majority to justify a no-duty rule based on a categorical exemption. After all, we rejected the argument in *Hoyt* that public policy categorically protected the tavern from acting reasonably under the circumstances involving a fight outside the premises in the parking lot. 829 N.W.2d at 777. We should reject it here as well.

The notion that alcohol-fueled strip clubs will be subject to "limitless liability" is a slogan, but it is not really much of an argument. We rejected the same reasoning in *Hoyt*, where we noted that all the tavern had to do under the approach of the case is employ reasonable safety precautions. *Id.* at 780. The rule espoused here is simply that in ejecting patrons from their establishments, strip clubs where alcohol is consumed must exercise the same degree of ordinary care as any other actor with respect to risks arising from their conduct. The strip club will be exposed to liability only with respect to drunken patrons who are ejected from the premises without the exercise of reasonable care for their safety. It is the majority that proposes a special immunity rule that permits tortfeasors to escape from ordinary tort rules that would otherwise permit a jury to find negligent conduct based on the general duty of care and the principles of breach articulated in the Restatement (Third).

The majority characterizes the only available option for the defendants was to detain Holly. This claim, of course, does not support a no-duty determination to be decided by the court but, to the extent relevant, presents a jury argument that the duty of reasonable care has not been breached because there were no reasonable alternatives. But this is not a detention case. The actor's conduct was not unreasonable because he did not forcibly detain Holly; it was unreasonable because of the manner in which Holly was ejected from the club in the middle of a dark night while wearing dark clothes in a rural setting at about the time

that most bars were closing. The available option was not to "detain" Holly (ironically in a place where he wished to remain) but instead to not forcibly eject the docile Holly from the premises without taking more action to protect his safety. Instead, strip club staff could have instructed the docile Holly to remain within the club at a safe place, or stay outside the door with staff, until a cab or the police arrived. If the strip club staff had given Holly the choice of either accepting a cab or the club calling the police, a jury could conclude that the docile Holly would have chosen to wait for a cab under the circumstances. And, if he did not wait, a jury might have concluded that the police would have arrived within the time frame necessary to avoid the accident. Again, whether there were any available options is not a question of duty but is a question of breach of duty. And breach of duty is ordinarily for the fact finder, not the court.

In any event, I think the approach in *Groh*, *Tobin*, *Mitchell*, and all the off-premises school cases cited in *Mitchell* present the proper approach. I conclude that the defendants, when they chose to intervene with respect to the intoxication of Holly, had a duty to act reasonably. Whether the defendants acted reasonably under the circumstances is a matter for the jury to determine.

**D. Analysis of Scope of Liability Under Restatement (Third) of Torts.** The next question is whether the risk that led to Holly's injuries was within the scope of liability. It seems to me the answer to that question is a clear yes. Indeed, one of the staff testified that he told Holly's compatriot that "[i]t's not safe for him to be walking out around here with dark clothes on." The staff knew that the strip club was located in a remote area and that roadways in the vicinity were not well lit. The conduct of the defendant gave rise to the risks that led to the injury in this case. The

fact that the injuries occurred off premises are plainly not determinative under the approach embraced by this court in *Mitchell*.

**E. Question of Breach of Duty under Restatement (Third) of Torts.** Under the Restatement (Third), the next question that must be confronted is breach of duty. Here, the question is straightforward: What could the defendants have done? The plaintiff's security expert noted that it would have been reasonable for the Beach Girls club to have a written security policy and training for staff on how to implement the policy. He further reviewed the records from the West Des Moines Police Department, noting that police were called due to disorderly patrons on numerous occasions. According to Murphy, the policy and procedure of Beach Girls was to either call the police or a cab for intoxicated patrons. In light of Holly's docile demeanor, Murphy found it would not have been reasonable to require him to leave the property. Murphy concludes that "more likely than not, had the Beach Girl Club exercised reasonable and ordinary care, the injuries and subsequent death of Daulton Holly would not have occurred."

In other words, because Holly was docile, he would have quietly remained on premises if the defendants had told him that they would call the police if he did not accept a cab. Or, they should have told his compatriot that the police would be called if he did not accept a cab. Instead of taking these reasonable measures, according to the plaintiff, they threw Holly into the darkness knowing full well that an intoxicated person wearing dark clothes in a remote area was facing serious safety risks. And they were right.

The defendants say nonsense. To use a term from the majority's argument, "liability goes with control." The majority embraces the breach of duty argument of the defendants, claiming that the risks were

"speculative," that the option of forced detention was unreasonable, and that there was nothing the defendants could have done.

This debate, however, is not part of the duty analysis. The question here is not whether the defendants owed a duty, which they most certainly did, but whether the defendants offered enough evidence to create a triable issue on the question of breach of duty.

Here, the structure of the Restatement (Third) becomes very important. Ordinarily, questions of duty are for the court. But questions of breach of duty are for the fact finder. Under the Restatement (Third), whether there was anything a reasonable strip club could have done under the circumstances is a question of fact. By mischaracterizing the issue in this case as a duty issue, the majority shifts the authority to decide the fact issue from the jury to the court. For example, the majority characterizes the question of whether the defendants should have called the police as a duty question. It is not. It is a question of breach of the duty of care. The defendant's position is that by failing to call the police, or by failing to advise Holly and his compatriot that their choice was either call a cab or talk to the police, the defendants breached their duty of care.

In my view, there is enough for the plaintiffs to get to a jury. The question regarding the efficacy of calling the police is ordinarily a question of fact. *See Christopher v. Father's Huddle Café, Inc.*, 782 N.E.2d 517, 526–27 (Mass. App. Ct. 2003). According to the plaintiff's expert, "the Beach Girl Club breached the standard of reasonable and ordinary care by requiring Mr. Holly to leave the premises in an impaired state and to allow him to continue walking on a minimally lighted street." In my view, a rational jury could find that the ejection of Holly from the strip club under the circumstances of this case was a causal factor that led to his unfortunate death.

**F. Concepts of Comparative Fault.** The majority opinion is highly critical of the intoxicated Holly. And, of course, there is fault that could be assigned to the driver who struck Holly, Hauser. Fair enough. Plausible arguments can be made that the fault for the accident rests with Holly, the strip club, the intoxicated driver, or all three in some percentage combination. But the issue of comparative fault among potentially liable tortfeasors is also a question for the jury in this case. *See Fulmer v. Timber Inn Restaurant and Lounge, Inc.*, 9 P.3d 710, 717 (Or. 2000) (en banc), *superseded in part by statute on other grounds*, Or. Rev. Stat. § 471.565(1) (2020).

**IV. Conclusion.**

In my view, for the above reasons, summary judgment in the above case should have been denied. I would affirm the decision of the court of appeals and remand the case to the district court for further proceedings consistent with this opinion.